# Blumenthal Brothers Chocolate Company *v.* Commonwealth.

Argued December 7, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKIN-SON, JR., MENCER and ROGERS. The evidentiary hearing was held before Judge MANDERINO and by stipulation, the parties agreed to submit the case to the judges of the court other than Judge MANDERINO who did not participate in the legal argument nor in the decision.

*William P. Thorn*, with him *Wolf, Block, Schorr & Solis-Cohen, Leslie B. Handler*, and *Handler & Handler*, for appellant.

*Edward T. Baker*, Deputy Attorney General, for appellee.

OPINION BY PRESIDENT JUDGE BOWMAN, May 9, 1972:

These tax appeals by Blumenthal Brothers Chocolate Company challenge resettlement of appellant's 1965 and 1966 fiscal year corporate net income tax liability, which resettlements were sustained by the Board of Finance and Revenue and from which action the instant appeals were taken.

The Corporate Net Income Tax Act, Act of May 16, 1935, P. L. 208, as amended, 72 P.S. §3420a *et seq.*, imposes a tax upon that portion of corporate net income reflecting business carried on within Pennsylvania which, as relevant here, is determined by application of the so-called tangible property, the wages and salaries and the gross receipts fractions.

Appellant does not take issue with the Commonwealth's allocation and apportionment of its tangible property or its wages and salaries. It does, however, challenge the inclusion of its entire gross receipts for fiscal 1965 and 1966 within its taxable net income.

The "Corporate Net Income Tax Act" directs that: "Of the remaining third [after tangible property and wages and salaries have been apportioned between business activities within and outside the Commonwealth], such portion shall be attributed to business carried on within the Commonwealth, as shall be found by multiplying said third by a fraction, whose numerator is the amount of the taxpayer's gross receipts from business assignable to this Commonwealth as hereinafter provided, and whose denominator is the amount of the taxpayer's gross receipts from all its business. . . ."

72 P.S. §3420b(2)(c)(3).

As to that portion of gross receipts which should be assigned to a corporation's business transactions outside of the Commonwealth, the Act further defines which gross receipts may properly escape taxation and adds a warning to the effect that the Commonwealth looks to substance rather than form in calculating the gross receipts fraction. "The amount of the corporation's gross receipts from business assignable to this Commonwealth shall be, (1) the amount of its gross receipts for the taxable year except those negotiated or effected in behalf of the corporation by agents or agencies chiefly situated at, connected with, or sent out from, premises for the transaction of business maintained by the taxpayer outside of the Commonwealth, and except rentals and royalties, and interest and dividends, (2) rentals or royalties from property situated, or from the use of patents, within this Commonwealth, and (3) dividends and interest, except such dividends and interest attributable to the business conducted on premises maintained by the taxpayer outside the Commonwealth. If a corporation maintains an office, warehouse, or other place of business in a state other than this Commonwealth for the purpose of reducing its

tax under this subsection, the department shall, in determining the amount of its gross receipts from business assignable to this Commonwealth, include therein the gross receipts attributed by the corporation to the business conducted at such place of business in another state." 72 P.S. §3420b(2).

Appellant asserts that sales made by two of its representatives in northern New Jersey should not be included in the gross receipts allocated to its business activities in Pennsylvania because such sales were ". . . negotiated or effected in behalf of the corporation by agents or agencies chiefly situated at, connected with, or sent out from, premises for the transaction of business maintained by the taxpayer [corporation] outside of the Commonwealth. . . ." The substance of appellant's argument is that sales totaling over $5,000,000 for each of the fiscal years (of total receipts of about $16,000,000 for each year) should be excluded from the numerator of the gross receipts fraction because the two representatives were employees of the appellant who were making sales of appellant's product on behalf of the corporation from out of state offices *maintained* by the appellant.

The basic facts are not in dispute. The controversy generating these appeals concerns the characterization which the parties place upon the sales activities of the two representatives, one a company called E. Berg and Sons and the other an individual named Charles R. Pariente. However, since no stipulation as to the facts has been entered into by the parties, it is necessary for this Court to make such findings as are necessary for disposition of the case.[1] Act of April 22, 1874, P. L. 109, 12 P.S. §689.

_____

[1] A hearing to make an evidentiary record was held before Mr. Justice LOUIS L. MANDERINO, then a Judge of this Court. Subsequently, legal argument was heard before the Court en banc and

## FINDINGS OF FACT

1. Blumenthal Brothers Chocolate Company (Blumenthal) was a Pennsylvania corporation organized in 1926 engaged in the business of manufacturing and merchandising chocolate, cocoa, and candy products during the fiscal years 1965 and 1966.[2]

2. Blumenthal used approximately thirty representatives outside the state of Pennsylvania who were independent food or candy brokers rather than direct salesmen of the corporation.

3. Blumenthal also employed several direct representatives, two of whom operated in the metropolitan New York area from northern New Jersey.

4. These two representatives were E. Berg and Sons (Berg) and Charles R. Pariente (Pariente) who together generated over $5,000,000 in sales for Blumenthal in each of the fiscal years 1965 and 1966.

5. Berg rented offices for its own business convenience in Teaneck, New Jersey, from which sales orders were executed for Blumenthal's products.

6. Berg was paid strictly on a commission basis by Blumenthal for sales generated and not on a salary basis during fiscal 1965 and 1966.

7. Berg was supplied with order forms, stationery, business calling cards imprinted with the company name and product samples by Blumenthal to facilitate sales activities.

8. Blumenthal's name appeared on the building directory at the Teaneck address and in the telephone

---

a stipulation entered into between counsel for both parties that these consolidated appeals might be disposed of by the judges of this Court other than Mr. Justice MANDERINO.

[2] On January 1, 1969, appellant-corporation was acquired by the Ward Candy Company which changed the corporate name to Ward Chocolate Company. Such transfer of ownership occurred after the tax period here in question.

directories for the metropolitan New York area for the number at the address but Berg actually executed the lease in its own name, and paid the rent and the telephone bills.

9. Berg devoted 90% to 95% of its time to representing Blumenthal, having only one other representative connection during fiscal 1965 and 1966.

10. Sales orders entered into by Berg who had authority to quote prices, approve credit and enter into sales contracts on the basis of oral agreements with Blumenthal were forwarded to the company headquarters in Philadelphia and subsequently shipped to the customer from Philadelphia.

11. Pariente rented offices in Hackensack, New Jersey, and enjoyed substantially the same relationship with Blumenthal as did Berg in terms of commissions, office rental and telephone arrangements, manner of effecting sales, and contact with the Philadelphia headquarters.

12. Pariente's arrangement with Blumenthal differed from that of Berg in that he could not approve credit and required such approval from Philadelphia before consummating a sales agreement.

13. Berg and Pariente generally received daily telephonic instructions from the principals of Blumenthal in Philadelphia as to their sales transactions.

The crucial determination in these appeals concerns the relationship of Berg and Pariente to the Philadelphia headquarters. If they were agents connected in fact to Philadelphia, the sales which they generated are properly allocable to Pennsylvania; if, on the other hand, they were connected with offices maintained by the appellant outside of Pennsylvania in Teaneck and Hackensack, then their sales are properly to be excluded from the numerator of the gross receipts fraction.

In *Commonwealth, Appellant, v. General Foods Corporation,* 429 Pa. 266, 239 A. 2d 359 (1968), the Supreme Court makes the point that allocation inside or

outside Pennsylvania must turn on a factual conclusion as to the "office connection" of the agents who negotiated and effected the sales. Discussing this question, that Court said: "Where an 'agent' is involved and no allocable wages are present, the same determinations must be made. An independent agent or broker, of course, may be connected with an office of a taxpayer; if so, the receipts attributable to him are allocable to that office. On the other hand, an independent agent may not be directed or controlled in any way by or from an office of the taxpayer; in such a case, the receipts generated by him may be allocable to Pennsylvania if they thereby reflect corporate activity in Pennsylvania. If, however, they result from activity elsewhere (in or out of the United States), they are not allocable to Pennsylvania simply because of the residue theory[3] of the statute." 429 Pa. at 280, 239 A. 2d at 366.

Both parties cite several cases construing the meaning of maintenance of an office outside of the Commonwealth. Of note is the fact that the Act of May 16, 1935, P. L. 208, had contained the phrase, "owned or rented" which was changed to "maintained" by the Act of May 5, 1939, P. L. 64. In a case heavily relied on by appellant, the Supreme Court has said: "It is obvious, of course, that there is a difference between the phrase 'owned or rented' and the word 'maintained.' 'Owned or rented,' fairly interpreted, means just what it denotes— that the taxpayer either owns real estate (in whole or in part) outside of Pennsylvania on, in or with which it is located or connected in some way or that the taxpayer is the lessee or sublessee of premises outside of Pennsylvania on, in or with which it is located

---

[3] The "residue theory" involves the concept that when some net income cannot factually be proven to be allocable to a specific situs outside Pennsylvania, or factually proven to belong in Pennsylvania, by default it must be allocated to Pennsylvania for tax purposes.

or connected in some way. 'Maintained,' on the other hand, is less precise. Among its definitions in Webster's Third New International Dictionary is the following: '. . . 4: to provide for: bear the expense of . . .' (Geo. C. Merriam Company, Springfield, Mass.: (1961). Thus, neither directly owning nor renting premises is necessary to satisfy its requirements. Correspondingly, it would seem that if the taxpayer in some way (and there may be many ways) is wholly or partly responsible for the presence or upkeep of premises outside of Pennsylvania, it has met the statutory test regardless of the form of the arrangement." *Commonwealth v. Hellertown Manufacturing Company, Appellant,* 438 Pa. 134, 142, 264 A. 2d 382, 386-87 (1970).

Although appellant admittedly neither rents nor owns the Teaneck and Hackensack premises, this alone is not conclusive of the issue of its "maintenance" of such premises. In concluding that an out of state office did exist for net income tax purposes where an independent agent paid the rent, the Supreme Court has said: "Does the record support the finding of the court below that the Buffalo [New York] office was rented by the defendant [taxpayer in Pennsylvania]? The lease was taken in the name of Prince [the out of state representative]. It appears, however, that the Buffalo office had been operated in a small room and defendant directed Prince to secure larger quarters where a more extensive stock of goods could be maintained by defendant. This was done and on the window of this office defendant's name was placed. There its goods were stored. By listing this office as its office in the telephone directories it advertised the fact that the premises were its office. When the commissions were remitted from the home office, Prince was required to first pay from those sums the rent and wages of salesmen. We are in accord with the conclusion of the court

below that Prince in renting the office did so as defendant's agent and on its behalf. When we consider the realties in determining the fundamental question, the correctness of the findings of the court below is apparent, and the conclusion is irresistible that defendant was actually carrying on business outside the state through premises rented by it." *Commonwealth, Appellant, v. Continental Rubber Works*, 347 Pa. 514, 519-20, 32 A. 2d 878, 880 (1943).

However, the indicia of such business being carried on outside the state so that sales effected by such outside office may be excluded from the gross receipts numerator are often difficult to classify. In *Continental Rubber, supra,* orders were solicited from Buffalo and sent to the home office in Pennsylvania for processing and shipping; further, commissions rather than salaries were paid to the Buffalo representatives who held themselves out to be employees and agents of Continental Rubber, used its business cards and listed their telephones in its name even though they paid their own expenses and office rents from their commission. The facts are strikingly similar to those in the cases before us. Its holding might control the instant appeals except that the Supreme Court appears to have allowed the exclusion of gross receipts generated at the Buffalo office on the basis of the out of state employee's peculiar method of selling and contracting. Therefore, *Continental Rubber* does not provide a satisfactory solution to the question before us since its holding is limited to the unique business arrangement in that case.

Looking again to the *Hellertown* case, we find a specific check list for determining whether a taxpayer has factually established an out of state office within the definition of "maintaining". " '[T]he essentials may differ with the type of business, the type of agency or employment contract involved or the manner in which

the taxpayer conducts its business. With this in mind the following check list might prove useful: (1) Name of taxpayer in telephone directory, on building directory if there is one, on door leading to entrance of office or otherwise displayed on the office exterior. (2) Stationery and calling cards showing office address. (3) Storage of inventories or display samples at location in question. (4) A written or oral lease for the space involved and the direct or indirect payment of rent. (5) A written or oral agreement for the maintenance of an office by the agent or agency on behalf of the taxpayer.' We recognize that the determination of whether or not premises are 'Maintained' by a taxpayer may be difficult, and we agree that the various factors must be weighed. In the above listing, for example, the fourth factor would be directly pertinent to proving actual rental of premises and would provide an easy answer. That is, if taxpayer pays for the use of premises and denominates each payment as 'rent,' whether to the lessor-owner or to a lessee-sublessor, the premises are being maintained by the taxpayer because he is actually renting them. However, where a payment is made which is not clearly for the use of premises and is not denominated as rent, the situation requires careful scrutiny." 438 Pa. at 143, 264 A. 2d at 387.

With this check list in mind, our careful scrutiny of the facts before us compels conclusion that appellant does not maintain an office in Teaneck or Hackensack. Unlike the factual situation in *Hellertown,* appellant carried on no definite business activity at the premises in New Jersey for which it paid the actual lessee of the premises a fee for the latter's services on behalf of the appellant at such premises. Hellertown, a Pennsylvania corporation, had paid a management fee to its parent corporation in Ohio for the "service" of purchasing all

of its output and providing administrative assistance. Speaking of the Ohio office, the Supreme Court said: "The office itself is real, fulfills a genuine purpose in adjusting functions between parent and subsidiary and actually serves as the nerve center of Hellertown's operations." 438 Pa. at 147, 264 A. 2d at 389.

We could hardly characterize the tangential sales activities in New Jersey as the "nerve center" of Blumenthal Brothers Chocolate Company.

While not completely controlling because of the unique facts and because its holding was questioned by later discussion in the *General Foods* case,[4] the decision in *Commonwealth v. The Minds Coal Mining Corporation, Appellant*, 360 Pa. 7, 60 A. 2d 14 (1948) provides us with some persuasive reasoning. Adopting the opinion of the lower court, the Supreme Court rejected the appellant's contention that it maintained a West Virginia office and concluded that the employees of the Bulah Coal Mining Company in West Virginia were agents selling coal for the Pennsylvania company.

"Whether or not Bulah was an independent contractor is, in our opinion, irrelevant. The real test is whether or not Bulah was an agent of the defendant for the purpose of negotiating sales of the defendant's coal. If so, the sales are attributable to Pennsylvania under the statutory provisions. The coal sold belonged to the defendant and not to Bulah. The business of the defendant was to mine and sell coal. We cannot conceive how

---

[4] "However, the meaning of this case is made somewhat obscure by several factors: (1) the fact that Minds' only office was actually in Pennsylvania and (2) the partly confusing situation regarding the sales themselves. Although the lower court (whose opinion we adopted) went to some lengths to state that the sales in question were those from the New York company to customers and not from Minds to the New York company, the recited facts actually appear to belie this position." 429 Pa. at 277, 239 A. 2d at 365.

any person could reach the conclusion that Bulah did not negotiate and effect sales of the defendant's coal.

"The defendant concedes that Bulah was an agent of the defendant for the sale of coal. It insists, however, that Bulah was an independent contractor, liable only for the terminal result; that the defendant had no control over or liability for Bulah or its employes with regard to their activities in negotiating sales or otherwise; and that in making sales, Bulah was engaged in its own business and not in the defendant's business.

"In our view of the case, the activities of Bulah have a two-fold aspect. First, in negotiating the sales, it was promoting the business of the defendant. It sold the defendant's coal, not its own coal. The proceeds of the sales belonged to the defendant, and not to Bulah. Secondly, in rendering the service to the defendant it was promoting its own interests at the same time. The commissions earned by its efforts are corporate receipts to Bulah and result from corporate activity by it. The earning of commissions was its own business." 360 Pa. at 16, 60 A. 2d at 19-20.

The relationship of Bulah to the Pennsylvania corporation echoes the arrangement between Berg and Pariente and the appellant here. These two representatives negotiated sales for and on behalf of the appellant and incidentally maintained offices in New Jersey primarily for their own convenience. They sold appellant's chocolate not their own product from offices outside the Commonwealth of Pennsylvania not intended as branch offices but as useful locations to handle their selling activities. We are reminded of the hotel rooms kept by salesmen for their occasional convenience and use in cities outside of Pennsylvania by employees of a Philadelphia cigar manufacturer which were ruled not to be out of state "premises for the transaction of business" under the old statutory language of "rented or

owned." *Commonwealth v. Bayuk Cigars, Inc., Appellant,* 345 Pa. 348, 28 A. 2d 134 (1942). While this case predates the 1939 amendatory language, its discussion of rooms used occasionally even though leased for long periods as not coming within the statutory language is helpful if not controlling.

We must conclude that Berg and Pariente in reality were agents working in connection with the Philadelphia headquarters. All sales orders were sent to Philadelphia for processing and shipping; both agents were in telephonic communication with Philadelphia several times daily on the average and subjected to the direct authority of the Philadelphia principals; the appellant exercised no direct or indirect control over the Teaneck or the Hackensack premises in terms of rent payments, providing furnishings, or even making visits to them. In sum, these premises were secondary to the primary connection of the subject agents to Philadelphia.

We therefore make the following

CONCLUSIONS OF LAW

1. Blumenthal Brothers Chocolate Company during the fiscal years 1965 and 1966 did not maintain premises outside the Commonwealth of Pennsylvania for the purpose of transacting business at such premises within the statutory definition set forth in the "Corporate Net Income Tax Act", 72 P.S. §3420b.

2. E. Berg and Sons and Charles R. Pariente were independent agents of Blumenthal Brothers Chocolate Company who negotiated and effected sales generating gross receipts outside the Commonwealth of Pennsylvania in behalf of the corporation but were not connected with premises for the transaction of business maintained by the corporation outside the Commonwealth of Pennsylvania within the statutory definition set forth in the "Corporate Net Income Tax Act", 72 P.S. §3420b.

3. The gross receipts generated by these two agents are properly allocable to Pennsylvania for the fiscal years 1965 and 1966.

4. The resettlements by the Board of Finance and Revenue of the gross receipts fractions determined to be

$$\frac{16,556,947}{16,556,947}$$ for the fiscal year 1965 and

$$\frac{15,920,716}{15,920,716}$$ for the fiscal year 1966,

allocating all gross receipts of the Blumenthal Brothers Chocolate Company should be sustained.

5. The appeals of Blumenthal Brothers Chocolate Company should be dismissed.

## ORDER

Now, May 9, 1972, the appeals of Blumenthal Brothers Chocolate Company from the decisions of the Board of Finance and Revenue in making resettlements of its corporate net income tax liabilities for the fiscal years 1965 and 1966 by allocating the entire gross receipts of the corporation to business activities within the Commonwealth of Pennsylvania are hereby dismissed. Unless exceptions hereto are filed within thirty (30) days of the filing of this order, as provided by law, judgment is hereby directed to be entered in favor of the Commonwealth in the amount of $3,419.09 for the fiscal year 1965 and in the amount of $3,447.30 for the fiscal year 1966, with interest at the statutory rate of six (6%) percent per annum from the dates when said corporate net income taxes were originally due, being the amounts of appellant's 1965 and 1966 taxes as resettled less amounts heretofore reported and paid by appellant.